# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| ALICE HIPES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:17-cv-04014-JES-JEH |
| ) | |
| KATIE JUDGE, DARREN GAULT, and ) | |
| ALTERNATIVES FOR THE OLDER ) | |
| ADULT, INC., ) | |
| ) | |
| Defendant. ) | |

## ORDER AND OPINION

This matter is now before the Court on two motions for summary judgment. Defendants Alternatives for the Older Adult and Katie Judge filed a Motion for Summary Judgment (D. 63[1]) and a Memorandum in Support (D. 63-8). Defendant Darren Gault filed a separate Motion for Summary Judgment (D. 64) and a Supplement Brief in Support (D. 64-1). Plaintiff Alice Hipes filed a Response (D. 66, D. 67) to each motion and Defendants filed a Reply (D. 69, D. 70). For the reasons set forth below, Defendant Darren Gault's Motion is GRANTED and Defendants Alternatives for the Older Adult and Katie Judge's Motion is GRANTED.

### BACKGROUND

Plaintiff Alice Hipes ("Hipes") filed a Complaint, since amended, against Defendants Alternatives for the Older Adult ("Alternatives"), a nonprofit corporation that provides services to elderly individuals in Rock Island County, Katie Judge ("Judge"), an employee of Alternatives, and Darren Gault ("Gault"), a police officer with the East Moline Police

---

[1] Citations to the Docket in this case are abbreviated as "D. __."

1

Department. This case stems from Defendants' investigation of Hipes for financial exploitation of an elderly individual. The following facts are undisputed.

At all relevant times, Hipes was a caregiver for an elderly person, Donald Kinchner ("Kinchner"). D. 64-1, at 6. Hipes had been Kinchner's caregiver for ten years prior to February 2015. *Id.* Hipes began caring for Kinchner while employed at Trinity Hospital as a visiting nurse. *Id.* at 9. After she was fired in 2011, Hipes and Kinchner had a private arrangement for Hipes to continue as his caregiver. *Id*. at 8-9. Kinchner paid Hipes $800 per month to work three days per week for six to seven hours per day. *Id.* at 9.

In early 2015, Alternatives received an initial report of neglect involving Kinchner. D. 63, at 3. Alternatives assigned the case to Judge to investigate the initial report. *Id.* Judge visited Kinchner in his residence and observed his environmental situation to be substandard. D. 64-1, at 7. Judge observed a strong smell of urine and noted Kinchner appeared to have incontinence problems. *Id.* There was very little food in Kinchner's residence and much of the non-perishable food items were expired. *Id.* Judge also observed Kinchner had little clothing and the clothing he did possess appeared worn and tattered. *Id.* Judge documented speaking to Hipes one time during the initial investigation. D. 66-1, at 12. During that conversation, Hipes explained her work schedule and duties, which included helping Kinchner with bathing, laundry, cooking, cleaning and finances. *Id.*

While the initial investigation for neglect was ongoing, Alternatives received a second report involving Kinchner for potential financial exploitation. D. 63, at 3. Kinchner's bank had reported suspicious activity on his account. D. 64-1, at 7. *Id.* In her investigation documentation, Judge stated she met two bank employees at Kinchner's residence to discuss his finances on February 4, 2015. D. 66-1, at 14. The bank employees were concerned about several checks

written to cash over the past five years and the lack of funds in his savings and checking accounts. *Id.* Judge noted that when they explained their concerns to Kinchner, he said Hipes handles his finances. *Id.* Judge further noted that when they discussed setting up direct deposit for Kinchner's Social Security income, Kinchner repeatedly stated he did not want to get in trouble. *Id.* When asked why he thought he would get in trouble, Kinchner said he did not know, and he wished Hipes was present to know if it was okay to sign the direct deposit paperwork. *Id.* Judge documented meeting with an attorney later that day to discuss Kinchner's case because she was unsure how to proceed. *Id.* at 16. The attorney advised that Kinchner would need an appointed guardian and that he could file a motion to freeze Kinchner's assets. *Id.* The attorney further advised Judge to contact Gault to see whether Hipes should be prosecuted for financial exploitation. *Id.* Judge met with Gault and told him she believed there was more than $70,000 of Kinchner's money "unaccounted for" over the past four years. *Id.* at 18.

Gault began to investigate the potential financial exploitation after meeting with Judge. D. 64-1, at 6. Throughout his investigation, Gault authored an Incident/Investigation Report and several Case Supplemental Reports, in which he describes witness interviews and his review of Kinchner's bank accounts. D. 64-4. Gault examined the activity on Kinchner's checking and savings accounts from January 2013 through December 2014. *Id.* at 11-15. Gault noted that among the many checks written to cash, some were endorsed by both Kinchner and Hipes while others were endorsed only by Kinchner. *Id.* at 11. Kinchner had an income of approximately $1,300 per month in pension and Social Security checks sent to his house. *Id.* at 6. Gault asked Alternatives how much an individual of Kinchner's age might need for basic necessities and factored that figure into his analysis. D. 64-3, at 6. Gault concluded there was $41,150 unaccounted for over the two-year period. *Id.*

3

Gault conducted a recorded, noncustodial interview of Hipes on February 10, 2015. D. 64-4, at 17; D. 67-1, at 59[2]. Hipes said she was paid $800 per month and would ask Kinchner for additional money as needed to pay her bills and other expenses. D. 64-1, at 10. Hipes said she assisted Kinchner with many duties, including his banking. *Id.* Hipes said she often drove Kinchner to the bank, helped him write checks and pay bills, and was the only person to assist Kinchner with his finances. D. 64-3, at 8; 64-4, at 19. Hipes admitted she often wrote out checks on Kinchner's account and Kinchner would sign them. D. 64-1, at 10. Hipes agreed with Gault that she had received approximately $10,000 from Kinchner over the two-year period in addition to her salary. *Id.* at 6.

After he interviewed Hipes, Gault met with Rock Island County Assistant State's Attorney Beth Adams ("ASA Adams") and presented the facts he had gathered to date. *Id.* at 11. ASA Adams determined there was probable cause that Hipes had violated a state statute and she instructed Gault to obtain an arrest warrant. *Id.* Gault appeared before Judge Chickris that same day. *Id.* Judge Chickris found probable cause to arrest Hipes and signed the warrant. *Id.* Hipes was arrested on February 11, 2015 for financial exploitation of an elderly person and she posted bail on February 19, 2015. D. 67-1, at 6.

On March 10, 2015, Gault testified at Hipes' preliminary hearing before Judge Meersman. D. 64-1, at 11; D. 67-1, at 45-58. Gault explained Hipes was a medical power of attorney for Kinchner but did not have authority over his finances. D. 67-1, at 52. Gault testified there was a total of $33,600 in pension checks to Kinchner that had been cashed and never deposited into his accounts. *Id.* at 51-2. When he added the pension checks and all the checks written to cash, Gault determined there was $41,150 of Kinchner's money unaccounted for over

---

[2] D. 67-1, at 59 states "Video Interview of Alice Hipes, 2/10/2015" and "Exhibit M." Plaintiff submitted a disc containing the recording of that interview.

4

the two-year period. *Id.* at 53. Gault had given credit for the $800 per month for Hipes' wages and $250 per month that he an estimated for groceries and toiletries. *Id.* Judge Meersman found there was probable cause that a crime had occurred. *Id.* at 56.

On April 8, 2016, the Rock Island County Circuit Court dismissed with prejudice the felony charge against Hipes. D. 21, at 3.

**LEGAL STANDARD**

Summary judgment is proper where the materials in the record demonstrate there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The role of the judge in resolving a motion for summary judgment is not to weigh the evidence for its truth, but to determine whether sufficient evidence exists for a jury to return a verdict in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court will construe the record "in the light most favorable to the non-movant" in deciding whether the case involves genuine issues of fact requiring a trial. *Payne v. Pauley*, 337 F.2d 767, 770 (7th Cir. 2003).

State actors performing discretionary functions are protected by qualified immunity when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Abbott v. Sangamon Cty.*, 705 F.3d 706, 713 (7th Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982) (citations omitted)). To overcome a defendant's invocation of qualified immunity, the plaintiff must show (1) a constitutional violation occurred, and (2) the constitutional right was clearly established at the time of the official's alleged misconduct. *Id*. The prongs may be addressed in any order. *Id*. To determine whether the constitutional right was clearly established, the specific context of each case must be analyzed to determine whether the right is established

to the point that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). The burden is on the plaintiff to demonstrate a clearly established right has been violated. *Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008).

To support a malicious prosecution claim under 42 U.S.C. § 1983, the plaintiff must demonstrate (1) she has satisfied the elements for the state law cause of action of malicious prosecution; (2) the malicious prosecution was committed by state actors, and (3) that the plaintiff was deprived of liberty. *Reed v. City of Chicago*, 77 F.3d 1049, 1051 (7th Cir. 1996). Under Illinois law, the plaintiff must show (1) the defendant commenced or continued an original criminal or civil judicial proceeding, (2) the proceeding was terminated in favor of the plaintiff, (3) there was an absence of probable cause for such a proceeding, (4) the presence of malice, and (5) the plaintiff suffered damages. *Stoller v. Costco Wholesale Corp.*, 2020 U.S. Dist. LEXIS 7429, *16, 2020 WL 247459 (N.D. Ill. 2020).

## DISCUSSION

Hipes filed the instant case on January 17, 2017 seeking damages pursuant to 42 U.S.C. § 1983 and claims of malicious prosecution. D. 21. A prior Order dismissed Hipes' Fifth Amendment claims against Gault and Judge, as well as a Fourth Amendment claim against Judge. D. 29. The surviving claims consist of a Fourth Amendment claim against Gault and malicious prosecution claims against all Defendants. *Id.*

*Fourth Amendment and Malicious Prosecution Claims Against Gault*

Gault argues he is entitled to qualified immunity on Hipes' Fourth Amendment claim because Hipes cannot show she had a constitutional right to be free from the actions Gault took against her and Gault's actions were such that a reasonable officer would not have been on notice

that it violated Hipes' clearly established constitutional rights. D. 64-1, at 5. In the alternative, Gault argues that even without qualified immunity, there is no genuine issue of material fact that would allow a jury to reasonably find Gault violated Hipes' constitutional rights because there was probable cause for her arrest. *Id.*

Hipes argues against summary judgment because she contends there is a material issue of fact as to whether there was probable cause for her arrest. D. 67-1, at 7. Hipes argues Gault is not entitled to qualified immunity because he deliberately gave misleading information at the preliminary hearing. *Id.* at 6. Specifically, Hipes claims that Gault implied she had stolen $41,150 of Kinchner's money when Gault testified about the total amount unaccounted for. *Id.* Hipes also alleges Gault knew Kinchner was not competent, but he said otherwise under oath at the preliminary hearing. *Id.*

In a prior Order addressing his motion to dismiss, the Court found Gault was not entitled to qualified immunity at that time because the Court did not have any details surrounding Gault's determination of probable cause to arrest Hipes. D. 29, at 4-5. "Probable cause has been defined as a state of facts that would lead a person of ordinary caution and prudence to believe, or entertain an honest and strong suspicion, that the person arrested committed the offense charged." *Burrell v. Vill. Of Sauk Vill.*, 2017 IL App (1st) 163392, *P16, 96 N.E.3d 375, 380, 420 Ill. Dec. 290, 295 (internal quotation marks omitted). A court must look at the totality of the circumstances at the time of the arrest to determine whether probable cause existed. *Burrell*, 96 N.E.3d at 380. The state of mind of the one commencing the prosecution is at issue, rather than the actual facts of the case or the guilt or innocence of the accused. *Id.* "Only a mistake or error of gross negligence will affect the question of probable cause when there is an honest belief by the complainant that the accused is probably guilty of the offense." *Id.*

7

Now viewing the complete record, even when viewed in a light most favorable to Hipes, the totality of the circumstances establishes the existence of probable cause for Hipes' arrest. Gault conducted an independent review of Kinchner's financial records after meeting with Judge. By his own analysis of the records, Gault concluded there was $41,150 unaccounted for over a two-year period. Gault interviewed a bank employee who was concerned about the activity on Kinchner's accounts and Hipes's relationship with Kinchner. In her interview with Gault, Hipes admitted to using at least $10,000 of Kinchner's money for her personal use and said she was the only person to assist Kinchner with his finances. In his deposition, Gault said he believed Hipes was being manipulative and deceptive for her own financial benefit. D. 64-3, at 13. Gault believed it was unethical for Hipes to get money from Kinchner for "whatever she needed" in addition to her salary, but he was not sure whether it constituted a violation of the law. *Id.* at 12. He chose to confer with the State's Attorney's Office rather than arrest Hipes at that time. *Id.* ASA Adams told Gault she believed there was probable cause to charge Hipes with financial exploitation and instructed him to obtain an arrest warrant. D. 64-1, at 11. Judge Chickris agreed with ASA Adams and Gault that there was probable cause and signed the warrant to arrest Hipes. *Id.*

Hipes has not established any set of facts to show Gault acted with gross negligence leading up to her arrest or that Gault did not have an honest belief that Hipes had committed an offense. Instead the record shows Gault was deliberate and cautious in gathering evidence. There is no genuine issue of material fact as to whether Gault had probable cause to arrest Hipes for financial exploitation of Kinchner and as a result, Gault is entitled to qualified immunity with regards to Hipes' false arrest claim. Even without the cloak of qualified immunity, Hipes' false arrest claim against Gault fails because of the existence of probable cause. "The existence of

8

probable cause to arrest is an absolute defense to any § 1983 claim against a police office for false arrest … " *Abbott*, 705 F.3d at 713 (citing *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006)). The Court now turns to Hipes argument that Gault contributed to her continued prosecution through his testimony at the preliminary hearing.

Hipes argues Gault is not entitled to qualified immunity because he continued the prosecution against her through alleged misrepresentations he made at the preliminary hearing. D. 67-1, at 6. At the preliminary hearing, Gault testified about his investigation. *Id.* at 45-58. Gault described how the investigation began when Judge contacted the East Moline Police Department after becoming aware of suspicious activity on Kinchner's account. *Id.* at 48. Gault described his interview of Hipes, in which she estimated she had received over $10,000 in the last two years to pay her bills in addition to her monthly salary. *Id.* at 50. Gault testified that he also interviewed Kinchner, who said he only gave Hipes money for his groceries and denied giving Hipes money for her personal expenses. *Id.* at 51. The Assistant State's Attorney asked Gault, "How was the money transferred from Miss [sic] – Mr. Kinchner to Miss Hipes?" *Id.* Gault responded:

> So, Mr. Kinchner had a checking account at Triumph Community Bank, and I looked at the canceled – or, the cleared checks, copies of the checks, and most of them were either to Alice Hipes or to cash. Many of those were endorsed on the back by Mrs. – Alice Hipes, and then, some of them were not. I interviewed the teller at the bank, the Triumph Community Bank, and she said Mrs. Hipes was the one who was coming in and cashing those checks for herself. There was also $33,600 in pension checks that were also cashed that were never deposited into his account.

9

D. 67-1, at 51-2. Gault testified that Hipes was not on Kinchner's account and had no legal authority over Kinchner's finances, though Hipes was Kinchner's medical power of attorney. *Id.* When asked whether he located any checks "that were clearly to groceries and household expenses," Gault testified that Hipes said she paid cash for groceries, but he did locate "some checks for legitimate expenses," such as one to repair the heating and air conditioning. *Id.* The Assistant State's Attorney then asked Gault "How much appeared to be missing?" and Gault explained he calculated a total of "$41,150 in cash that [was] unallocated for." *Id.*

Hipes' defense attorney conducted a brief cross-examination of Gault. *Id.* at 54-6. Hipes' attorney asked, "So you're estimating that there's $41,000 missing?" and Gault responded "Yes." *Id.* at 55. Hipes' attorney made no attempt to clarify how Gault defined "unallocated." Gault was not asked at any point how much he believes Hipes exploited from Kinchner or whether Gault was suggesting Hipes took the entire $41,150.

With regards to Kinchner's competency, the Assistant State's Attorney asked Gault whether he believed Kinchner was "still of clear mind." *Id.* at 52. Gault responded that Kinchner "seemed fine" and then described how a physician said Kinchner was in good health one day prior to his interview. *Id*. Gault said Kinchner acknowledged Hipes was paid $800 per month. *Id.* at 53. Gault had testified earlier in the hearing that Kinchner said he only gave Hipes money for his own groceries. *Id* at 51. Hipes' attorney cross-examined Gault about the relationship between Kinchner and Hipes. *Id.* at 54. Gault said Kinchner had described Hipes' duties as cooking, cleaning, and running errands. *Id.* Gault testified that Kinchner spoke about Hipes as "just somebody that worked there" rather than as if she was a family member. *Id.* Hipes' attorney then asked, "And you said that there was a letter from the doctor saying that Mr. Kinchner was in good health?" to which Gault replied "Yes." *Id*. Hipes' attorney did not cross-examine Gault

10

about his interpretation of the phrase "of clear mind" or whether he considered Kinchner a competent source of information.

Hipes points to her interview with Gault, in which Gault made statements about Kinchner's lack of short-term memory and that Kinchner's mind "is pretty gone." D. 67-1, at 5. Hipes was taking part in a voluntary, noncustodial interview at that time. In both custodial and noncustodial situations, government agents are permitted to use trickery, deceit, and even impersonation, but they are not permitted to make threats or promises. *U.S. v. Kontny*, 238 F.3d 815, 817 (7th Cir. 2001). *See also Frazier v. Cupp*, 394 U.S. 731, 739, 22 L. Ed. 2d 684, 89 S. Ct. 1420 (1969) (fact that police misrepresented statements of co-suspect insufficient to make voluntary confession inadmissible); *U.S. v. Rutledge*, 900 F.2d 1127, 1131 (7th Cir. 1990) ("far from making the police a fiduciary of the suspect, the law permits the police to pressure and cajole, conceal material facts, and actively mislead"). Therefore, any inconsistencies between Gault's statements during the Hipes' interview and his testimony at the preliminary hearing are not evidence that Gault made intentional misrepresentations to the court about Kinchner's competency.

Qualified immunity gives public officials "breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085, 179 L. Ed. 2d 1149 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986)). "As long as officers of reasonable competence could disagree on [the] issue, immunity should be recognized." *Purtell*, 527 F.3d at 621 (internal quotations omitted). The burden was on Hipes to show she had a clearly established right that was violated by Gault's testimony at the preliminary hearing because no reasonable officer would testify as

Gault did under those circumstances. Additionally, Hipes makes much ado about how Gault answered questions about Kinchner's competency, she has not established that Gault knowingly violated the law or whether it would have had any effect on Judge Meersman's finding of probable cause. Even viewing the facts in a light favorable to Hipes, Hipes has not shown she had a clearly established right that was violated by Gault's testimony. As such, Gault is entitled to qualified immunity from liability for Hipes' § 1983 claims of false arrest and continued prosecution.

To support her claim of malicious prosecution against Gault, Hipes again argues there is an issue of material fact as to whether there was probable cause for her arrest and Hipes points to Gault's alleged misrepresentations at the preliminary hearing. D. 67-1, at 7. As discussed above, there was probable cause for Hipes' arrest. The appearance of probable cause to institute judicial proceedings acts as an "absolute bar to action for malicious prosecution." *Burrell*, 96 N.E.3d at 380 (citations omitted). With regards to his preliminary hearing testimony, Hipes has not shown Gault made any intentional misrepresentations under oath about the unaccounted-for money or Kinchner's competency.

Even if one assumed there was no probable cause for Hipes' arrest or that Gault had contributed to the continued prosecution of Hipes through his testimony at the preliminary hearing, Hipes still must prove Gault acted with malice. *Johnson v. Target Stores, Inc.*, 341 Ill App. 3d 56, 76, 791 N.E. 2d. 1206, 1222 (1st Dist. 2003). To show malice, a plaintiff must prove the prosecution was initiated against her for a reason other than to bring the plaintiff to justice. *Barnes v. City of Centralia*, 943 F.3d 826, 833 (7th Cir. 2019). Gault said he believed it was unethical for a salaried caregiver to ask for additional money for her personal expenses. He also stated he believed Hipes was manipulating and deceiving Kinchner for her own financial benefit.

There are no facts in the record that establish Gault acted with malice or that he was motivated by anything other than to bring Hipes to justice. Hipes has not established all the elements of malicious prosecution against Gault, nor has she shown there is an issue of material fact concerning this claim. As a result, Gault is entitled to summary judgment on the malicious prosecution claim.

*Malicious Prosecution Claims Against Alternatives and Judge*

Alternatives and Judge argue for summary judgment in their favor on the malicious prosecution claims because Hipes has not shown Alternatives and Judge commenced the criminal proceedings against her. D. 63-8, at 4. They also argue Hipes has not established that there was an absence of probable cause and that Alternatives and Judge were motivated by malice. *Id.*

Hipes argues Judge and Alternatives did commence judicial proceedings by providing information to Gault which began the criminal investigation and by Judge initiating civil proceedings against Hipes. D. 66-1, at 2. Hipes claims Judge acted with malice when Judge presented false information in civil proceedings to establish a guardianship, to freeze Kinchner's assets, and to order a physical examination. *Id.* at 4. Hipes also argues that because Judge participated in an interview of Kinchner, which was video recorded by Gault, Judge was supporting the continued prosecution of Hipes despite knowing Kinchner was incompetent. *Id.* at 5.

"Illinois courts have long recognized that suits for malicious prosecution are not favored because persons acting in good faith should not be deterred from reporting crimes by the fear of unfounded suits." *Barnes*, 943 F.3d at 833. Malice has been defined in Illinois courts as "[t]he intent, without justification or excuse, to commit a wrongful act." *Johnson*, 341 Ill. App. 3d at

76. As stated above, if it appears there was probable cause to initiate the proceedings, that fact alone "constitutes an absolute bar to an action for malicious prosecution." *Id.* at 73.

Here, Hipes has not established Judge and Alternatives were motivated by malice. Judge and Alternatives are tasked with investigating and protecting elderly and disabled individuals who may be subjected to abuse or neglect. Judge's act of meeting with Gault did commence a criminal investigation of Hipes, but as it was discussed at length above, Gault, ASA Adams, Judge Chickris, and Judge Meersman all found probable cause for Hipes' subsequent arrest. Hipes has not established how Judge's participation in the recorded interview of Kinchner was motivated by something other than to create a record for the prosecution and to bring Hipes to justice.

Through seeking civil orders to establish a guardianship, to freeze Kinchner's assets, and to order a physical examination, Judge appeared to be carrying out her duty to investigate the possible abuse or neglect of Kinchner. Hipes claims that during those civil proceedings, Judge falsely alleged to the court that Hipes had refused to explain the cash withdrawals or the use of the funds and that Judge had no factual basis to claim Kinchner's estate had been substantially reduced. D. 66-1, at 4. Hipes has not established how these civil proceedings were against her, as they were focused on protecting Kinchner and his assets. Additionally, the civil proceedings were not terminated in favor of Hipes and nothing in the record supports the contention that Judge was acting with malice.

In her Amended Complaint, Hipes alleged that Alternatives "authorized its employee and agent Katie Judge to pursue the prosecution, and assist in the investigation leading to the prosecution of Alice Hipes[.]" D. 21, at 7. Hipes further alleged Alternatives' actions were "willful and malicious" towards Hipes because it "ignored facts that established that Ms. Judge's

14

claims were false[.]" *Id.* It is undisputed that Alternatives employed Judge; therefore, Alternatives authorized Judge to investigate any claim of abuse or neglect of an elderly or disabled person. However, this does not establish that Alternatives was aware of or authorized any alleged wrongful acts by Judge.

In her Response to the Motion for Summary Judgment, Hipes argues Alternatives' actions constituted malice because "Alternatives had taken a previous position that a $500.00 per day expenditure for adult day care was a reasonable expense[.]" D. 66-1, at 4. Hipes bases this argument solely on facts provided by Bret Johnson ("Johnson"), who was retained as an expert for Hipes on a pro bono basis. D. 63, at 5. In Johnson's deposition, he describes his own involvement with Alternatives, in which he brought charges against his sister for financial exploitation of his mother. D. 63-6, at 25. In Johnson's case, he said "my brother and I relied on Alternatives and the Illinois Department on Aging to assist, and they didn't." *Id.* at 3. Johnson further stated, "And they made conclusions, in my mother's case, for instance, that $500 a day, $180,000 a year was reasonable compensation for a part-time caregiver[.]" *Id.* Hipes does not provide any independent verification of Johnson's claims, nor does she explain how conclusions made in Johnson's case are applicable to any other investigation of financial exploitation by Alternatives, including the instant case. As such, the fact that Alternatives may have concluded what was reasonable compensation in an unrelated case is immaterial and does not establish the organization acted with malice here.

Even viewing the record in a light most favorable to Hipes, she has not met the burden of establishing all the elements of malicious prosecution by Alternatives or Judge. As a result, summary judgment is granted in favor of Alternatives and Judge for the malicious prosecution claims.

## CONCLUSION

For the reasons set forth above, Defendant Darren Gault's Motion (D. 64) is GRANTED and Defendants Alternatives for the Older Adult and Katie Judge's Motion (D. 63) is GRANTED. The Clerk is directed to close the case.

Signed on this 5th day of March, 2020.

                                                  s/James E. Shadid
                                                  James E. Shadid
                                                  United States District Judge